**AFFIRM as MODIFIED, and REVERSE and REMAND; Opinion Filed December 21, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-00583-CV

**CITY OF LANCASTER, Appellant**

**V.**

**WHITE ROCK COMMERCIAL, LLC, Appellee**

**On Appeal from the 191st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-06471**

## MEMORANDUM OPINION ON REHEARING

Before Justices Bridges, Brown, and Boatright
Opinion by Justice Boatright

Our memorandum opinion in this case issued on August 20, 2018. We deny the motion for rehearing, withdraw our opinion issued August 20, 2018, and vacate the judgment of that date. This is now the opinion of the court.

The City of Lancaster appeals a $4.7 million judgment rendered against it for breach of an economic development contract with appellee White Rock Commercial, LLC. The City contends that White Rock's claim is barred by immunity. It also urges that the district court erred in granting White Rock's motion for partial summary judgment on the issue of liability, and it raises several grounds for reversal related to the court's damages award. We conclude that White Rock's claims are not barred by immunity and that the court did not err in granting White Rock's motion for

partial summary judgment. However, we conclude that the court's damages award is erroneous in certain respects. We affirm, as modified, in part and reverse and remand, in part.

## BACKGROUND

The Texas Constitution authorizes the Legislature to "provide for the creation of programs and the making of loans and grants of public money" for "public purposes" that include the "development and diversification of the economy of the state." TEX. CONST. art. III, § 52-a (West Supp. 2017). To this end, the Local Government Code empowers a municipality to "establish and provide . . . programs for making loans and grants of public money . . . to promote state or local economic development and to stimulate business and commercial activity in the municipality." TEX. LOC. GOV'T CODE ANN. § 380.001(a) (West 2005). White Rock's claim is premised on the City's breach of a contract entered under the authority of this statute.

White Rock is a real estate developer. In 2007, it found out about an 83-acre site in Lancaster that the City wished to develop. The City was willing to provide economic incentives to promote the development. On August 13, 2007, White Rock entered two contracts that would provide funds to help develop the property: (i) an "Incentive Agreement" with the Lancaster Economic Development Corporation (the EDC),[1] and (ii) an "Economic Agreement" with the City. We will refer to the Economic Agreement as the 380 Agreement because it cites section 380.001 as the basis for the City's authority to enter the Agreement.

In both contracts, White Rock agreed to design and construct infrastructural improvements for a 1.4 million square-foot industrial park on the site. Such improvements were to be constructed according to the City's plans and specifications and were to include a new public regional storm drainage and detention system, a wastewater or sanitary sewer system, a water delivery system, off-site utility trunk connections, and streets. Both contracts made White Rock responsible for

---

[1] The Lancaster EDC administers funds and projects using the $0.25 sales tax receipts dedicated to economic development pursuant to the Development Corporation Act of 1979. The EDC has a board, separate from the City, composed of five members. The EDC is a separate taxable entity from the City with its own budget and guidelines for expending funds.

funding the "Project Costs"—the actual costs incurred by White Rock to construct the infrastructural improvements, plus a specified rate of interest—subject to reimbursement.

Each contract provided a different method of reimbursement. The Incentive Agreement authorized four $450,000 payments from the EDC to White Rock, totaling $1.8 million, with the first payment to be made ten days after commencement of the project. To trigger the remaining payments, this agreement required White Rock to construct a "Qualified Building"—a building or buildings on the project totaling at least 440,000 square feet—within thirty months of the City's final acceptance of the infrastructural improvements. White Rock would receive the remaining three payments according to a schedule, with the final payment on August 1, 2009.

In contrast, the 380 Agreement was implemented through an "annual economic development grant," apportioned into twenty scheduled payments by the City. The payments were to begin on October 1 following the first year that any office or industrial building constructed on the property was issued a certificate of occupancy, and they were to continue for an additional nineteen years. The grant was paid annually according to a formula based on the product of the fair market value of the improvements multiplied by the City's annual tax rate.

The parties disagree as to why there were two contracts. The City claims that the EDC had insufficient funds to fully reimburse the projected costs budgeted for the project, which totaled in excess of $3 million. In the City's view, the 380 Agreement's purpose was to reimburse White Rock's expected costs that were in excess of the $1.8 million to be paid under the Incentive Agreement. White Rock counters that the contracts created different obligations and that the Incentive Agreement provided additional incentives above the amounts to be paid under the 380 Agreement.

White Rock acquired the site in a private sale and completed the infrastructural improvements on June 22, 2009. The City accepted these improvements nearly two months later.

–4–

White Rock also constructed a 442,000 square-foot distribution center. This was the Qualified Building referenced in the Incentive Agreement. The EDC paid White Rock the four $450,000 installment payments required by the Incentive Agreement. The City issued a temporary certificate of occupancy for this building on June 1, 2012, but it did not make any annual economic grant payments under the 380 Agreement. White Rock sold the building at a loss, and its lender took the undeveloped remainder of the property through a deed in lieu of a foreclosure transaction. This remainder was thereafter developed by another developer.

White Rock sued the City in June 2014, alleging that it breached the 380 Agreement. White Rock also filed a motion for partial summary judgment, urging that that the evidence established the City's liability for breach of contract and negated the City's affirmative defenses. On January 28, 2015, the district court signed an order granting White Rock's motion on all elements of its breach of contract claim except for the amount of the damages, if any, to be determined at a later date. The order also ruled that each of the City's affirmative defenses failed as a matter of law.

The City subsequently filed a plea to the jurisdiction, claiming that it was immune from White Rock's breach of contract suit and that the 380 Agreement created a debt prohibited by the Texas Constitution. The district court held a hearing on the City's plea, and on June 30, 2016, the court signed an order denying the plea. The court conducted a bench trial on White Rock's damages in November 2016. White Rock presented evidence that it had incurred Project Costs of $ 2,677,288.79 and that its damages, after also adding the interest applicable under the 380 Agreement, totaled $4,726,217.53. On March 8, 2017, the court rendered judgment awarding White Rock (i) actual damages consistent with the foregoing amounts, (ii) prejudgment interest of $413,252.69, (iii) court costs, and (iv) postjudgment interest at the rate of 3.75%, compounded annually. The City filed a motion for new trial and to set aside the court's partial summary-judgment order, which the court denied following a hearing. The City then appealed the judgment.

**ANALYSIS**

The City raises six issues that challenge the judgment, including the district court's interlocutory orders that merged into the judgment.

**I.**
**Plea to the Jurisdiction**

The City urges that it is immune from White Rock's suit. An assertion of governmental immunity implicates a court's subject matter jurisdiction, and such immunity is properly asserted in a plea to the jurisdiction. *Harris Cty. v. Annab*, 547 S.W.3d 609, 612 (Tex. 2018). A movant bears the burden in its plea to establish that it is entitled to immunity, and if it meets this burden, the burden then shifts to the non-movant to establish, or at least raise a fact issue on, a waiver of immunity. *Lubbock Cty. Water Control and Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 305 (Tex. 2014). Subject matter jurisdiction is a question of law that we review de novo. *Annab*, 547 S.W.3d at 612. In the posture of this appeal from a final judgment following a trial, we review the entire record, including the evidence admitted at trial, to the extent it bears on the City's jurisdictional argument. *ATI Enters., Inc. v. Din*, 413 S.W.3d 247, 250–51 (Tex. App.—Dallas 2013, no pet.). With these standards in mind, we must determine whether immunity applies and, if it does, we must defer to the Legislature's decision to waive, or not to waive, such immunity. *Wasson Interests, Ltd. v. City of Jacksonville* ("*Wasson I*"), 489 S.W.3d 427, 435 (Tex. 2016).

**A.      Applicability of Immunity**

In its first issue, the City contends that it is immune from suit under the common law doctrine of sovereign immunity. The City explains that political subdivisions of the State are immune from suit unless the Legislature unambiguously waives immunity, and it contends that the Legislature did not do so. And in its reply brief, the City asserts that its actions in entering into the 380 Agreement were governmental rather than proprietary. The distinction between governmental and proprietary functions applies to breach of contract claims. *Id.* at 439. The City notes that

economic development corporations have sovereign immunity under chapters 504 and 505 of the Local Government Code. It concludes that, because the City "acted in the same capacity as the EDC" in entering into the 380 Agreement, "it was clearly and unequivocally carrying out a governmental function consistent with case law." However, the City provides no legal authority in support of that conclusion. Chapters 504 and 505 apply to economic development corporations, not municipalities, and we are aware of no judicial decision concluding that a municipality can either act in the capacity of an economic development corporation, or carry out a governmental function in that capacity.

White Rock contends that the City was never entitled to immunity because it engaged in a proprietary rather than a governmental function. White Rock quotes the Texas Supreme Court in *Wasson I* for the proposition that a proprietary function is one undertaken "for the private advantage and benefit of the locality and its inhabitants." *Id*. at 433. White Rock notes that the 380 Agreement expressly provided that it "will further the objectives of the City, will benefit the City and the City's inhabitants and will promote local economic development and stimulate business and commercial activity in the City." White Rock contends that this shows that the City sought a private advantage and benefit of the City and its inhabitants, that the City was engaging in a proprietary rather than a governmental function, and that the City was therefore not entitled to immunity under *Wasson I*.

That case, however, addressed section 101.0215 of the Civil Practice and Remedies Code, which expressly identifies "street construction and design," "sanitary and storm sewers," and "water and sewer service" as governmental functions and not proprietary functions. TEX. CIV. PRAC. & REM. CODE § 101.0215(a)(3), (9), (32) (West Supp. 2017). Each of those functions was expressly covered by the 380 Agreement. If section 101.0215 had not identified those functions as either governmental or proprietary functions, we would apply a four-part test to determine whether

they were governmental, as the Texas Supreme Court did in an opinion issued after submission of our case. *Wasson Interests, Ltd. v. City of Jacksonville* ("*Wasson II*"), 559 S.W.3d 142, 150 (Tex. 2018). However, because the functions expressly covered by the 380 Agreement are expressly identified in section 101.0215 as governmental functions, we do not apply the *Wasson II* test. We are instead guided by section 101.0215's treatment of those functions. *Wasson I*, 489 S.W.3d at 439. We conclude that these functions are what the Legislature has told us they are: governmental functions. Therefore, the City is immune from suit absent a waiver by the Legislature. We sustain the City's first issue.

## B.     Waiver of Immunity

In its second issue, the City contends that its immunity was not waived under Chapter 271 of the Local Government Code. A waiver of governmental immunity must be clear and unambiguous. *Oncor Elec. Delivery Co. LLC v. Dallas Area Rapid Transit*, 369 S.W.3d 845, 849 (Tex. 2012). Under Chapter 271, "[a] local government entity that . . . enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract," subject to certain terms and conditions not at issue here. TEX. LOC. GOV'T CODE ANN. § 271.152 (West 2016). A "contract subject to this subchapter" includes "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity." TEX. LOC. GOV'T CODE ANN. § 271.151(2)(A) (West 2016). We must look beyond the title of a written contract to determine whether it satisfies Chapter 271's waiver requirements. *Church & Akin*, 442 S.W.3d at 301.

The City argues that the 380 Agreement was not a "contract subject to this subchapter" because it (i) lacked an essential term—the time of performance, *City of Houston v. Williams*, 353 S.W.3d 128, 138–39 (Tex. 2011)—and (ii) did not relate to the provision of goods or services.

### 1.      Time of Performance

The City contends that its obligation to pay is "contingent on the completion of performance by White Rock in an undetermined period of time," citing section 5.3 of the Agreement. The City relies on a decision from a sister court that held a contract to build a home lacked several essential terms, including the size of the house contemplated, the price of the house on a per-square-foot or other basis, or the time for completing construction. *DKH Homes, LP v. Kilgo*, No. 03-10-00656-CV, 2011 WL 1811435, at *3 (Tex. App.—Austin May 11, 2011, no pet.) (memo. op.). In response, White Rock points to section 7.1 of the Agreement, which authorizes the City to terminate if White Rock does not take adequate steps to cure a default within thirty days (or in the instance of a non-monetary default, within ninety days) after receiving notice from the City, such default including a failure to commence or to complete construction of the project. White Rock urges that this provision obligated it to perform within a reasonable time, citing case law that a contract is not "too indefinite to be enforced . . . so long as the language used fixes an ascertainable fact or event by which the term of the duration of the contract can be determined." *Brittian v. Gen. Tel. Co. of Sw.,* 533 S.W.2d 886, 891 (Tex. Civ. App.—Fort Worth 1976, writ dism'd). It alternatively contends that the law will imply a reasonable time where no time for performance is stated in the contract, citing *Moore v. Dilworth*, 179 S.W.2d 940, 942 (Tex. 1944).

Whether a contract has all the essential terms to be an enforceable agreement is a question of law. *Ferachi v. Cady*, No. 2-07-355-CV, 2009 WL 1506899, at *4 (Tex. App.—Fort Worth May 28, 2009, pet. denied) (mem. op). The material terms are determined on a case-by-case basis, and each contract should be considered separately to determine its material terms. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). In this case, we conclude that the law implied a reasonable time for White Rock to complete performance of its contractual obligations. Absent such an interpretation, section 7.1's provision regarding the cure of a default, and the termination

following a failure to cure, would never apply. This interpretation would render section 7.1 meaningless, in contravention of the principle that courts attempt to avoid such a construction. *Vest v. Gulf Ins. Co.*, 809 S.W.2d 531, 533 (Tex. App.—Dallas 1991, writ denied). For this reason, we conclude that the Agreement stated its essential terms.

## 2. Goods or Services

We next consider whether the 380 Agreement was for the provision of "services," a term not defined in Chapter 271. The Texas Supreme Court has held that the term "is broad enough to encompass a wide array of activities," and "includes generally any act performed for the benefit of another." *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 839 (Tex. 2010) (citation and internal quotation marks omitted). The services provided "need not be the primary purpose of the agreement." *Id.* However, section 271 does not extend to "'contracts in which the benefit that the local governmental entity would receive is an indirect, attenuated one.'" *Id.* (quoting *Berkman v. City of Keene*, 311 S.W.3d 523, 527 (Tex. App.—Waco 2009, pet. denied) (brackets omitted)); *cf. Church & Akin*, 442 S.W.3d at 303 ("When a party has no right under a contract to receive services, the mere fact that it may receive services as a result of the contract is insufficient to invoke chapter 271's waiver of immunity.").

The City urges that White Rock, as the owner of the property, was required by the City's subdivision ordinance to construct the infrastructural improvements at issue. The City claims that its ordinance required this infrastructure, once built, to be turned over to the City to maintain in perpetuity. In the City's view, it merely financed White Rock's construction of the infrastructural improvements that White Rock was already required by law to install. The City's plea attached an affidavit of the City Manager/Chief Budget Officer, who averred that the City did not receive a direct benefit from the project. The City also urges that it was White Rock who benefitted from the infrastructure in the form of an increase in its property's value.

–10–

In support of its position, the City relies on cases holding that contracts were not for the provision of services because their benefit to the municipality was attenuated. *Berkman* involved child welfare services that were at most a benefit to the state given that the city in that case had no independent obligation to provide for the welfare of children who were wards of the state. 311 S.W.3d at 527. In *East Houston Estate Apartments, L.L.C. v. City of Houston*, a city loaned federal and private funds to a property owner to rehabilitate an apartment complex within the city. 294 S.W.3d 723, 726, 736–37 (Tex. App.—Houston [1st Dist.] 2009, no pet.). While the city might benefit in a general way from refurbished apartments and low-income housing, our sister court concluded that nothing in the contract obligated the property owner to provide any municipal service directly to the city. *Id.* at 736. Rather, the city was simply a conduit of federal funds and a facilitator of the project. *Id.*

In *City of Canton v. Zanbaka, USA, LLC*, a city economic development corporation contracted with the owner of "Duke's Travel Plaza" to fund a sewer line and lift station to its travel plaza located along Interstate 20. No. 12-12-0006-CV, 2013 WL 3377436, at *1 (Tex. App.—Tyler July 3, 2013, pet. denied) (mem. op. on reh'g). Despite the contract's stated purpose of providing new economic opportunities for the city, our sister court concluded that the contract's "tangible objective" was to provide funding for a sewer line and lift station to Duke's real property. *Id.* at *3. Any benefits to the EDC that would flow from this objective were indirect. *Id.*

In response to the City, White Rock relies on *Kirby Lake*, in which the supreme court held that section 271.152 waived a water control and improvement district's immunity. 320 S.W.3d at 838–40. In that case, residential developers contracted with the district to build water and sewer facilities—i.e., water and sewer lines—according to the district's specifications. *Id.* at 832. The contracts required the developers to lease the constructed facilities to the district free of charge until the district purchased them. *Id.* The district agreed to reimburse the developers for 70% of

their construction costs once it received voter-approved bond funds. *Id*. at 832–33. However, under applicable state regulations, the developers assumed the risk that the voters would never authorize public funds for acquiring the facilities. *Id.* at 832, 836. Based on the developers' obligation to "construct, develop, lease, and bear all risk of loss or damage to the facilities," the supreme court held that the contracts entailed services provided directly to the district. *Id.* at 839.

White Rock also cites *Dallas Area Rapid Transit v. Monroe Shop Partners, Ltd.*, 293 S.W.3d 839 (Tex. App.—Dallas 2009, pet denied), *disapproved on other grounds by Zachry Constr. Corp. v. Port of Houston Auth. of Harris Cty.*, 449 S.W.3d 98, 110 n.54 (Tex. 2014). In that case, we concluded that a contract that called for DART to sell, and for Monroe to purchase and develop, a historically significant property was a contract to provide services. *Id.* at 840–41. The contract required Monroe to accept a separate assignment of DART's responsibility of complying with the state's restrictions flowing from the historic nature of the property. *Id.* at 841. These facts, coupled with the contract's provisions that required various approvals from DART, brought the contract within the scope of section 271.152. *Id.*

In this case, the 380 Agreement expressly stated that it would benefit the City by growing its economy. Nevertheless, under the reasoning of *Berkman*, *East Houston Estate*, and *Zanbaka*, this benefit to the City is too attenuated for the section 271.152 waiver to apply. *Cf. Church & Aiken*, 442 S.W.3d at 306–07 (indirect benefits to water district from lessee's increased profits could not, alone, convert lessee's efforts to promote its own business into services to water district). However, the circumstances of this case demonstrate that White Rock's agreement to construct the infrastructural improvements was itself a direct benefit to the City, as were the facilities constructed in *Kirby Lake*. 320 S.W.3d at 838–40. Although the City contends that its subdivision ordinance independently required White Rock to construct the facilities at issue, the record evidences that White Rock would not have done so but for the City's solicitations. Specifically,

Hopkins testified that White Rock initially refused to develop the property but changed its mind after the City offered the incentives set forth in both the 380 Agreement and the Incentive Agreement. The City's agreement to pay White Rock for such construction is further evidence of a contract for services. *See Church & Aiken*, 442 S.W.2d at 304 ("[T[he waiver will typically apply only to contracts in which the governmental entity agrees to pay the claimant for the goods or services that the claimant agrees to provide to the governmental entity.").

In sum, the 380 Agreement entailed services provided directly to the City, thereby waiving its immunity under section 271.152. Accordingly, we need not decide whether the Agreement was also a contract for providing goods. We overrule the City's second issue.

## C.    Enforceability of Debt

The City's third issue contends that the 380 Agreement created a void debt that the district court lacked jurisdiction to enforce. The City cites two constitutional provisions that prohibit it from incurring a debt unless at the same time (i) a provision is made for annually assessing and collecting a sufficient sum to pay the debt's interest, and (ii) a sinking fund is created of at least two percent of the debt. TEX. CONST. art. XI, §§ 5, 7 (West Supp. 2017); *see McNeill v. City of Waco*, 33 S.W. 322, 324 (Tex. 1895) (concluding that "debt," as used in article 11, means any pecuniary obligation imposed by contract except for obligations to be satisfied out of current revenues or out of some fund within the municipality's immediate control). We are not persuaded by the City's argument. The constitutional provision authorizing Local Government Code section 380.001 provides that a "grant made as provided by this section"—that, as in this case, is not secured by a pledge of ad valorem taxes or financed by the issuance of bonds payable from such taxes—"does not constitute or create a debt for the purpose of any provision of this constitution." TEX. CONST. art. III, § 52-a. Thus, the grant made under the 380 Agreement was not a debt for purposes of the foregoing constitutional provisions.

–13–

The City alternatively relies on section 3.3 of the Agreement, in which it agreed "to use available funds . . . to reimburse DEVELOPER for Project Costs." The City interprets this provision to mean that its obligation was contingent on its appropriation of funds in its annual budget to pay the grant. Related to this point, the City Manager/Chief Budget Officer averred in an affidavit, attached to the City's plea, that the City did not appropriate any funds for fiscal years 2012 through 2016 to pay the grant.

The interpretation of an unambiguous contract, including whether a contractual provision creates a condition precedent to performance, is a question of law for the court. *Lambrecht & Assocs., Inc. v. State Farm Lloyds*, 119 S.W.3d 16, 26 (Tex. App.—Tyler 2003, no pet.). "[T]o make performance specifically conditional, a term such as 'if', 'provided that', 'on condition that', or some similar phrase of conditional language must normally be included." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 109 (Tex. 2010) (citation and internal quotation marks omitted). Though such phrases are not required, their absence is probative of the parties' intent to make a covenant—i.e., to agree to act or refrain from acting in a certain way— rather than to impose a condition precedent. *Id.* at 108–09. In the absence of conditional language, and to the extent another reasonable interpretation of the contract is possible, we will construe the terms as a covenant in order to prevent a forfeiture. *Id.* at 109. In this case, the 380 Agreement contains no such condition, nor does it contain other language that suggests the parties intended to condition the City's performance under the Agreement on its appropriation of funds to pay the grant. We therefore disagree with the City's interpretation of section 3.3.

The City also cites section 2.2 of the Agreement, which provides that "DEVELOPER's performance . . . shall not result in the creation of any claim against CITY for money or performance, any lien, charge, encumbrance or security interest upon any asset of CITY." White Rock responds that the Agreement, when read in its entirety, makes clear that the City was

–14–

obligated to reimburse White Rock's costs and that section 2.2 cannot reasonably be construed otherwise. We agree with White Rock's interpretation. Section 2.2 addresses only White Rock's performance under the Agreement, as opposed to the City's nonperformance if its own obligations. Moreover, sections 1.13 and 3.3 of the Agreement expressly obligate the City to reimburse White Rock's costs, though these sections differ whether such reimbursement is to be in full. Upon reviewing the Agreement in its entirety, we conclude that section 2.2 did not bar White Rock's claim against the City. We overrule the City's third issue.

## II.
## Breach of Contract

The City's fourth issue challenges the sufficiency of the evidence to support White Rock's breach of contract claim. The City refers to both legal and factual sufficiency, but the crux of its complaint is that the district court erred in granting White Rock's motion for partial summary judgment. *Cf. City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) ("[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review."). White Rock, the movant, bears the burden of proving that no material fact issue exists on the elements of its claim and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). We review a challenge to a traditional summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We view the evidence in the light most favorable to the City, the non-movant, indulging every reasonable inference in the City's favor, and resolving any doubts against the motion. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

### A.     Conditions Precedent

The City asserts that White Rock's summary-judgment motion did not establish the occurrence of what it labels as four conditions precedent to the City's obligation to pay the economic development grant. The performance of a condition precedent is an essential element of

a plaintiff's breach of contract claim. *Lidawi v. Progressive Cty. Mut. Ins. Co.*, 112 S.W.3d 725, 734 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

### 1. Completion of Infrastructure

The City contends that White Rock failed to give notice that it completed the infrastructural improvements. While the 380 Agreement obligated White Rock to complete the improvements, the contract's terms did not require White Rock to give notice of such completion. White Rock's summary-judgment motion attached an affidavit by Hopkins, along with supporting documentation, to show that (i) White Rock completed the improvements on June 22, 2009, and (ii) the City delivered a letter of acceptance on August 13 of the same year.[2] The City's opposing summary-judgment evidence did not contradict these facts.

### 2. Certificate of Occupancy

The City also complains that White Rock failed to show that a "final" certificate of occupancy was issued for a building on the project site. As described previously, section 5.3 of the Agreement required the City, following the issuance of a certificate of occupancy on any "Improvement[ ]"—defined elsewhere in the contract as an office or industrial building—to commence economic development grant payments. The Hopkins affidavit attached a "temporary" certificate of occupancy issued by the City on June 1, 2012, for the "Mobis" building constructed on the property. The "temporary" designation on the certificate has no significance given that the 380 Agreement does not require a "final" certificate. White Rock's summary-evidence thus demonstrates that the certificate-of-occupancy requirement was met. The City's summary-judgment evidence did not contradict this fact.

---

[2] The City objected to White Rock's summary-judgment evidence. However, the district court did not rule on these objections, and they are not asserted in the City's appeal brief as a basis for reversal.

### 3. Project Costs

The City complains that White Rock did not submit a written report itemizing all Project Costs within ninety days following the end of the fiscal year in which the infrastructural improvements were completed, as was required by section 4.6 of the Agreement. The City contends that it did not receive such a report until December 2015, when White Rock produced a report in response to the City's discovery requests. The City also points to Hopkins's trial testimony that he did not know whether White Rock submitted a report reflecting and itemizing its Project Costs. In the City's view, its obligation to pay White Rock never arose because White Rock failed to provide the cost report required by section 4.6. White Rock disputes the City's claims and urges that the City's brief omits Hopkins's trial testimony that he believed White Rock had in fact submitted a cost report "with some level of itemization."

We begin by considering the City's assertion that section 4.6 gave rise to a condition precedent. This provision contains no language that would suggest such a condition. *Solar Applications*, 327 S.W.3d at 109. However, section 7.2 of the Agreement provides that, "in the event" White Rock fails to furnish the City any required documentation within thirty business days following a written request from the City, "then" White Rock shall be in default. Section 7.3, in turn, suspends the City's obligation to pay any installment while White Rock is in default. Moreover, section 7.1 permits the City to terminate the Agreement "if" White Rock does not take adequate steps to cure its default within a specified period of time after receiving notice of the default. In the event of a termination, section 7.3 provides that White Rock shall forfeit any remaining payments under the Agreement. Taken together, the foregoing provisions establish a condition subsequent—"a condition referring to a future event, upon the happening of which the obligation becomes no longer binding upon the other party, if he chooses to avail himself of the condition." *Cmty. Health Sys. Prof. Servs. v. Hansen*, 525 S.W.3d 671, 682 (Tex. 2017) (citation

–17–

and internal quotation marks omitted). A condition subsequent excuses an already binding agreement, *id.* at 683, and unlike a condition precedent, it is an affirmative defense on which the defendant bears the burden of proof, *see Commercial Union Ins. Co. of Am. v. Stanmike Inv. Co.*, 475 S.W.2d 295, 297 (Tex. Civ. App.—Waco 1971, writ ref'd n.r.e.) (concluding that burden was on insurer to plead, prove, and establish occurrence of condition subsequent in order to avoid liability); *Knoff v. U.S. Fid. & Guar. Co.*, 447 S.W.2d 497, 500–01 (Tex. Civ. App.—Houston [1st Dist.] 1969, no writ) (concluding same); *Blue Bonnet Life Ins. Co. v. Reynolds*, 150 S.W.2d 372, 374 (Tex. Civ. App.—Eastland 1941, writ ref'd) (concluding same).

The City's answer did not plead White Rock's non-compliance with section 4.6, though it pled that White Rock did not comply with all applicable provisions of the contract. In addition, the City's summary-judgment opposition made no attempt to establish (i) such noncompliance, or (ii) that the City availed itself of the condition subsequent set forth above. Since the City failed to raise a fact question regarding this affirmative defense, section 4.6 did not foreclose the rendition of a partial summary judgment in White Rock's favor.

4.      Value of Improvements

Under section 5.3 of the Agreement, the formula for determining each economic development grant payment is based in part on "the fair market value of the industrial distribution and office improvements (as determined by the Dallas County Appraisal District)." The City urges in its appeal brief, as it did in the litigation below, that White Rock's notice of such value was a condition precedent to the City's contractual obligations. Related to this argument, the City's Economic Development Director averred in a supporting affidavit that White Rock did not notify the City of the value of the building for which the certificate of occupancy was issued. We disagree with the City's contention that section 5.3 gave rise to a condition precedent. This section does not require White Rock to provide notice of the improvements' value, nor does it condition the City's

obligation to pay on its receipt of such notice. *Solar Applications*, 327 S.W.3d at 109. Accordingly, White Rock's purported noncompliance with this provision did not preclude the rendition of a partial summary judgment in its favor.

**B.       Affirmative Defenses**

The City also asserts that fact issues regarding its affirmative defenses foreclosed the rendition of summary judgment against it, though it provides no additional briefing on this point. We have already addressed most of the City's defenses asserted in its summary-judgment opposition—specifically, governmental immunity, whether the 380 Agreement creates an unconstitutional debt, and conditions precedent. The sole remaining defense that we have not addressed is the City's assertion that the 380 Agreement was an illegal tax abatement because it required payments in excess of ten years on property not located in a "reinvestment zone," in contravention of section 312.204 of the Tax Code. TEX. TAX CODE ANN. § 312.204(a) (West 2015).[3] This section applies only to agreements to exempt property from taxation. *Id.* The 380 Agreement was not such an agreement; it instead obligated the City to make grant payments directly to White Rock. Accordingly, section 312.204 does not apply here.

In conclusion, upon viewing the summary-judgment evidence in the light most favorable to the City, we conclude that the district court did not err in granting White Rock's motion for partial summary judgment. We overrule the City's fourth issue.

### III.
### Damages

**A.       Credit for Sums Paid Under Incentive Agreement**

The City's fifth issue contends that the district court erred in refusing to credit the Lancaster EDC's $1.8 million payment against any balance owed by the City under the 380 Agreement.

---

[3] The City also pled failure of consideration, but it did not assert this defense in its opposition to White Rock's summary-judgment motion.

During its cross examination of Hopkins, the City attempted to establish that it was entitled to this credit plus an additional credit for impact fees that it had waived. White Rock objected to this line of questioning on the basis that the City had not pled the affirmative defense of offset. *See SAS & Assocs., Inc. v. Home Mktg. Servicing, Inc.*, 168 S.W.3d 296, 301 (Tex. App.—Dallas 2005, pet. denied) (noting that offset is an affirmative defense). The district court sustained White Rock's objection, thereby foreclosing any trial by consent regarding this defense.

The City contends that the court's ruling was erroneous because the defense of offset does not apply here. This defense, also referred to as setoff, has its roots in English bankruptcy law, which permitted a defendant to raise a debt that the plaintiff owed the defendant as a defense or counterclaim. *Bandy v. First State Bank, Overton, Tex.*, 835 S.W.2d 609, 618 (Tex. 1992). The right of setoff allows parties that owe each other money from different transactions, referred to as "mutual debts," to apply their debts to each other. *Sommers v. Concepcion*, 20 S.W.3d 27, 35 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). In the City's view, this defense does not apply to sums paid by a third-party, in this case, the Lancaster EDC, as opposed to sums paid by the debtor itself.

White Rock agrees that its specific objection at trial regarding the City's failure to plead offset was not a proper objection. It instead contends for the first time on appeal that the affirmative defense of payment, also not pled by the City, applies here. TEX. R. CIV. P. 94–95. It argues that we should uphold the district court's ruling on any valid ground, i.e., the City's failure to plead payment, even though the court's ruling was based on the City's failure to plead offset. *See State Bar of Tex. v. Evans*, 774 S.W.2d 656. 658 n.5 (Tex. 1989) ("[E[ven where the trial court errs in sustaining a specific untenable objection, an appellate court should uphold the ruling if there is any other ground for doing so, even though not urged below."). In response, the City's motion for rehearing points to a decision by one of our sister courts that declined to apply Rule 95 to a

defendant's pleading of payments paid by a third party. *Imperial Lofts, Ltd. v. Imperial Woodworks, Inc.*, 245 S.W.3d 1, 4–5 (Tex. App.—Waco 2007, pet. denied). We agree, and we therefore conclude that the City was not barred in this case from presenting evidence of the $1.8 million paid by the Lancaster EDC.

Turning to the merits of the City's argument, it contends that the 380 Agreement and the Incentive Agreement are unambiguous. Both contracts provide for the "reimbursement" of White Rock's actual costs incurred in the design and construction of infrastructural improvements. In the City's view, "[r]eimbursement is . . . a repayment for money one has already spent," not a bonus. White Rock counters that both contracts were ambiguous as to the amounts owed to it. It notes that the contracts referred to a "Financing Plan" that contemplated less than full reimbursement of all Project Costs, while at the same time they provided for "reimbursement in full." While Rock urges that parol evidence was admissible to resolve this purported ambiguity, and it points to Hopkins's testimony that the parties intended White Rock to receive payments under the 380 Agreement in addition to any payments made under the Incentive Agreement. In White Rock's view, the court must have determined that it was entitled to "reimbursement in full" under the 380 Agreement, plus four liquidated incentive payments under the Incentive Agreement. Pertinent to this argument, Hopkins testified, over the City's objection, that the contract provision limiting the City's reimbursement costs was inadvertently transposed from the Incentive Agreement to the 380 Agreement as the result of a cut-and-paste error.

When interpreting a contract, our primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). A contract is unambiguous if it can be given a definite or certain legal meaning. *Id.* On the other hand, a contract is ambiguous if it is "subject to two or more reasonable interpretations after applying the pertinent rules of construction," which require us to "examine and consider the entire

–21–

writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id*. Whether ambiguity exists is a question of law for the court. *First Bank v. Brumitt*, 519 S.W.3d 95, 105 (Tex. 2017). We may consider the context in which a contract is made in determining whether it is ambiguous, but we may not rely on extrinsic evidence to create an ambiguity or to give the contract a different meaning than what its language imports. *Id*. at 109–10.

Upon reviewing the 380 Agreement and the Incentive Agreement, we conclude that neither contract is ambiguous on the question of whether payments made to White Rock under the Incentive Agreement should be credited against the balance owed to it under the 380 Agreement. Both contracts provide for "reimbursement" of White Rock's Project Costs. We must give a contract term its "plain, ordinary, and generally accepted meaning." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). The term "reimburse" means "to pay back (an equivalent for something taken, lost, or expended) to someone." *Webster's Third New Int'l Dictionary of the English Language* 1914 (1981). While the 380 Agreement and the Incentive Agreement each contain differing terms whether the reimbursement at issue was to be "in full," neither of the agreements provide for an incentive payment to White Rock above and beyond its reimbursement. We conclude that Hopkins's testimony regarding the parties' intent with respect to the foregoing contracts cannot alter the contracts' plain meaning. Accordingly, the court erred in refusing to credit the EDC's $1.8 million payment against the balance owed by the City under the 380 Agreement. We sustain the City's fifth issue.

## B.      Evidentiary Issues

In its sixth issue, the City asserts that several of the district court's evidentiary rulings were erroneous. The admission or exclusion of evidence is committed to the trial court's sound discretion. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). The City

urges that the court erred by admitting into evidence a file (Plaintiff's Exhibit 9) containing vendor invoices and other documentation relating to Project Costs incurred by White Rock. The City contends that the invoices lacked a proper foundation and were inadmissible hearsay. We disagree. Exhibit 9 was accompanied by an affidavit, signed by Hopkins, which averred that White Rock (i) incorporated each of the invoices into its business records, and (ii) regularly relied on the accuracy of the invoices. Hopkins also averred that White Rock confirmed the accuracy of the invoices prior to incorporating them into its own records, thereby establishing the invoices' trustworthiness. Hopkins provided additional testimony at trial that supported the statements made in his affidavit. Based on the foregoing evidence, we conclude that White Rock laid a proper predicate for the admission of Exhibit 9 under the hearsay exception for records of regularly conducted activity. *Morris v. Branch Banking and Trust Co.*, No. 05-15-01249-CV, 2017 WL 3634334, at *8 (Tex. App.—Dallas Aug. 24, 2017, pet. denied) (mem. op.). The court did not err in overruling the City's objection to the admission of this exhibit.

The City also claims that the court erred by admitting a chart into evidence (Plaintiff's Exhibit 8) that tallied the invoice amounts from Exhibit 9 and identified the Project Costs category to which each invoice related. Exhibit 8 reflected that the costs incurred by White Rock totaled $2,677,288.79. The City argues that this exhibit lacked a sufficient predicate and was inadmissible hearsay. We again disagree. A predicate under this rule requires the offering party to show that the underlying documents are admissible, that they are voluminous, and that they were made available to the opposing party for inspection and use in cross-examination. *Leander v. Fin & Feather Club ex rel. Parten,* No. 06-10-00135-CV, 2012 WL 75815, at *7 (Tex. App.—Texarkana Jan. 11, 2012, no pet.) (mem. op.). As explained previously, the records underlying Exhibit 8 were admissible. The records were approximately 800 pages, and Hopkins testified that they were an "enormous amount of data." White Rock's counsel also represented to the court that the business records

affidavit proving Exhibit 9 was on file at least fourteen days before trial in compliance with Texas Rule of Evidence 902(10)(A), thereby establishing that they were made available to the City for inspection and cross-examination. We thus conclude that the court did not err overruling the City's objection to the admission of Exhibit 8.

In addition, the City urges that the court erred in overruling its objection, on relevancy grounds, to Hopkins's testimony regarding section 1.13 of the 380 Agreement. Hopkins testified that this section "created an expectation that we were going to be reimbursed in full for our cost, plus 8% per annum interest." As noted previously, we agree that Hopkins's testimony could not alter the unambiguous terms of the Agreement. *Brumitt*, 519 S.W.3d at 109. However, our conclusion that the court erred in refusing to credit the EDC's $1.8 million payment against the balance owed by the City under the 380 Agreement renders unnecessary our separate consideration of whether such evidence should have been excluded under Rule 402 of the Texas Rules of Evidence. We overrule the City's sixth issue with regard to the purported evidentiary errors that it asserts.

## C.     Legal and Factual Sufficiency

The City's sixth issue also raises several challenges under the rubric of legal and factual sufficiency. The parties each submitted proposed findings of fact and conclusions of law, but the district court made no findings. The City does not contend that the court erred in this respect, and we will therefore consider this case as one in which neither party requested findings of fact or conclusions of law. In this scenario, we will imply all facts necessary to support the court's judgment. *Shields Ltd, P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). If the reporter's record is filed on appeal, as it was here, "implied findings may be challenged on factual-and legal-insufficiency grounds in the same manner 'as jury findings or a trial court's [express] findings of fact.'" *Id.* (quoting *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989) (per curiam)). In

reviewing legal sufficiency, we must credit favorable evidence that supports the verdict, if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 827. In contrast, a factual sufficiency review requires us to weigh all of the evidence and to set aside findings only if they are so against the great weight and preponderance of the evidence to be clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996).

### 1.    Hopkins's Testimony

The City challenges the sufficiency of the evidence based on Hopkins's failure to explain "what formula [he] used to calculate the damages and/or interest accrued." Hopkins testified that White Rock incurred Project Costs of $2,677,288. The court admitted into evidence White Rock's Exhibits 8 and 9 which, as explained above, documented these costs. With the exception of the evidence submitted by White Rock regarding its insurance costs and the installation of a gas line, which we address below, we conclude that the court could reasonably infer that the foregoing costs were Project Costs subject to reimbursement. We also conclude that the court's determination in this respect was not contrary to the great weight and preponderance of the evidence. We need not consider whether the evidence was sufficient to support the court's award of interest because, for the reasons set forth herein, such interest must be recalculated on remand in light of this Court's reduction of White Rock's damages award.

### 2.    Lump Sum Award

Section 5.3 of the Agreement obligated the City to make annual economic development grant payments over a twenty-year period. These payments were based on the fair market value of the infrastructural improvements, as determined by DCAD, multiplied by the tax rate annually adopted by the City. The City argues that the court's lump-sum award does not conform to this provision, given that the provision does not contain an acceleration clause. It also urges that no evidence was admitted regarding the fair market value of the improvements and that the contract's

payment formula, based on future property assessments and future tax rates, precluded the award of a lump sum.

White Rock acknowledges that section 5.3 provided the mechanism through which the City was supposed to reimburse White Rock's costs, but it contends that the City's material breach permitted White Rock to recover a lump sum representing the total amount owed by the City. As support, White Rock cites *Republic Bankers Life Insurance Co. v. Jaeger*, in which the Texas Supreme Court held that "[t]he measure of damages in an action for breach of contract by repudiation is the total of all accrued payments plus interest, plus the present value of all unaccrued payments that the plaintiff would have received if the contract had been performed." 551 S.W.2d 30, 31 (Tex. 1976) (per curiam).

We agree with White Rock that the City's breach in this case permitted White Rock to recover a lump sum award. *Cf. Long Trusts v. Griffin*, 222 S.W.3d 412, 415 (Tex. 2006) (per curiam) (noting that, after defendant's material breach of contract, plaintiff may cease performance and sue for breach). We decline to consider whether White Rock should have offered evidence of the present value of the annual grant payments that had not yet accrued at that time. The City did not raise this issue at trial, nor does it complain on appeal that White Rock should have offered evidence of a discounted lump sum.

### 3. Non-Reimbursable Costs

The City urges that four types of costs incurred by White Rock were not reimbursable Project Costs under the terms of the Agreement. Under section 1.13, Project Costs were the costs incurred to "plan, design, permit, and construct" the infrastructural improvements, except for costs expressly excluded by the Agreement. The City claims that White Rock's reimbursable costs totaled $2,049,200.98, not the $2,677,288 sum awarded by the district court.

*Legal fees*

Hopkins testified that White Rock's evidence of costs included the legal fees that it incurred related to the project. In Hopkins's experience, it is customary and advisable to incur such fees when constructing infrastructural improvements. The City notes that the Agreement contains no specific reference to legal fees, but it fails to explain why these fees were unnecessary to plan, design, permit, and construct the infrastructural improvements. We conclude that the foregoing evidence supports the court's implied finding that White Rock's legal fees were within the scope of section 1.13. We also conclude that this implied finding was not contrary to the great weight and preponderance of the evidence.

*Insurance costs*

Section 6.1 of the Agreement obligated White Rock or its contractor, at its "sole expense," to obtain insurance while constructing the infrastructural improvements. White Rock's evidence included the construction-related insurance costs that it had incurred. The City contends that section 6.1's "sole expense" requirement excluded White Rock's insurance costs from reimbursement. We agree based on the plain language of this provision. We therefore conclude that no evidence supports a finding awarding reimbursement of White Rock's insurance costs.

*Title fees*

The City contends that White Rock's costs incurred from a title company were a non-reimbursable "soft cost." As support, it cites the testimony of Dipak Patel, a City Project Manager whom the City proffered as an expert witness for the purpose of comparing the costs submitted by White Rock to the Agreement's definition of Project Costs. The City relies on Patel's testimony that title costs are a "soft cost" and that, based on his experience, the title costs incurred in this case "seem[ ] to be a little bit" high. Patel declined to concede that title companies are always unnecessary to the development of infrastructural improvements, and the City points to no other

evidence to support its position. Viewing the evidence in the light most favorable to the court's implied findings, we conclude that the court could reasonably determine that White Rock's title fees were necessary to the development of the infrastructural improvements. We also conclude that the court's implied findings were not contrary to the great weight and preponderance of the evidence.

### *Installation of gas line*

White Rock's evidence also included invoices related to the construction of a gas line. The City contends that these costs were not within the 380 Agreement's definition of "Infrastructural Improvements," which, as described previously, relate to storm drainage, sewers, water delivery, "off-site utility trunk connections," and streets. We agree that the plain meaning of this definition does not include costs related to the construction of a gas line. Accordingly, no evidence supports the court's implied finding awarding these costs.

### 4. Interest

The City raises four complaints regarding the court's award of interest.

### *Commencement date for accrual of interest*

The City contests the court's selection of June 17, 2014—the date that White Rock filed its original petition—as the commencement date for calculating interest. The City contends that interest could not have accrued until at least December 2015, when White Rock submitted for the first time an itemized cost report. We decline to address this argument given our prior determination that White Rock's obligation to submit an itemized report was a condition subsequent that the City never triggered.

*Effect of $1.8 million payment*

The City also contends that the court erred in awarding interest on an amount of damages not reduced by the $1.8 million payment referenced above. We agree for the reasons set forth above.

*Duplicative interest*

In addition, the City contends that the court erred in awarding prejudgment and postjudgment interest "in that interest is contemplated in the Agreement and the [c]ourt cannot compound both interest rates on the award of damages." The City cited no supporting authority for this argument prior to filing its motion for rehearing, and we therefore decline to analyze the merits of its position at this late juncture. *See Bell v. Zurich Am. Ins. Co.*, 311 S.W.3d 507, 513 (Tex. App.—Dallas 2009, pet. denied) (concluding that appellant could not present new arguments not preserved by pre-submission brief (citing TEX. R. APP. P. 38.1(i))).

*Accrual date for postjudgment interest*

The judgment awarded postjudgment interest beginning on February 23, 2017, even though the judgment was not signed until March 8, 2017. The City contends that this was error. We agree because postjudgment interest accrues from the judgment date through the date the judgment is satisfied. *Long*, 426 S.W.3d at 77.

In conclusion, we sustain the City's sixth issue regarding the court's erroneous award of insurance costs, its erroneous award of costs for the installation of a gas line, and its award of postjudgment interest based on an erroneous accrual date. We otherwise overrule the City's sixth issue.

**CONCLUSION**

The district court did not err in denying the City's plea to the jurisdiction and in granting

White Rock's motion for partial summary judgment. However, the court's damages award was erroneous in certain respects, as set forth above. We reverse in part and remand this cause to the district court for the limited purpose of determining (i) the amount owed by the City after crediting the $1.8 million paid by the Lancaster EDC, (ii) the amount of insurance costs and gas-line installation costs, which we have held must be excluded from the court's damages award, and (ii) the recalculation of interest based on the revised damages award. We modify the judgment to reflect that postjudgment interest shall accrue from March 8, 2017, the date of the judgment. We otherwise affirm the judgment as modified.

/Jason Boatright/

JASON BOATRIGHT
JUSTICE


170583F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CITY OF LANCASTER, Appellant

No. 05-17-00583-CV          V.

WHITE ROCK COMMERCIAL, LLC,
Appellee

On Appeal from the 191st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-06471.
Opinion delivered by Justice Boatright.
Justices Bridges and Brown participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**, as modified, in part and **REVERSED** and remanded, in part. We **REVERSE** the trial court's damages award and remand this case for the purpose of determining (i) the damages owed by appellant after deducting the $1.8 million paid by the Lancaster Economic Development Corporation; (ii) the amount of appellee's insurance costs and gas-line installation costs to be excluded from the damages award; and (ii) the calculation of prejudgment interest based on the revised damages award. We modify the judgment to reflect that postjudgment interest shall accrue from March 8, 2017, the date of the judgment. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered December 21, 2018.